Dbake, Ch. J.,
delivered the opinion of the court:
This suit was originally brought in the name of the city of Carondelet. In 1870, however, that city was, by an act of the general assembly of the State of Missouri, merged in and made a part of the city of Saint Louis, which was, by the order of this court, substituted as claimant.
*457 The facts of the case are fully stated in the finding by the court, and they will therefore be referred to in this opinion only so far as may be necessary to a clear statement of the points at issue.
When, in 1803, the French province of Louisiana was ceded to the United States, Carondelet was an insignificant hamlet on the west bank of the Mississippi River, some six miles south of the then village of Saint Louis.
About a mile and a quarter south of Carondelet, as it then existed, a small stream, called the river Des Pbres, after flowing- easterly, emptied into the Mississippi.
During the French and Spanish rule in the province of Louisiana each village was entitled to more or less contiguous land as commons, to which all the inhabitants might resort for wood, hay, or other products of the soil. Carondelet had its commons; but, at the time of the cession, in 1803, neither the quantity nor the boundaries thereof had been defined or ascertained by any official act of the French or Spanish authorities.
After the cession the United States organized a board of commissioners to pass upon claims to land in the ceded territory. The inhabitants of Carondelet presented to this board their claim to u 6,000 arpents of land, situate adjoining- said •village, by virtue of a concession from Don Zenon Trudeau, lieutenant-governor of Upper Louisiana, dated the 7th December, 1796.” A majority of the board rejected the claim.
Had matters remained at that point,’there would have been no foundation for any title in Carondelet to any commons. But by the first section of the Act June 13, 1812, (2 Stat. L., p. 748,.) the claim of that village to commons was confirmed, in general terms, without any designation of boundaries or quantity; both of which were by the act required to be ascertained by an official survey; upon the completion of which, and its approval by the United States, the title would be complete without any further act on the part of Carondelet or the United States.
Out of this indefiniteness in the confirmation has grown all the protracted difficulty in which Carondelet, and those claiming title under her, have been involved.
The controversy in this suit is connected with the claim of Carondelet to commons south of the river Des Peres; but, nevertheless, the validity of her title to land south of that river is *458 not here involved. That has been finally and definitively settled in favor of Carondelet, by both the executive and the judiciary. But it was not settled for many years after the passage of the act of 1812, and the controversy here is in relation to acts of officers of the Government during the period of uncertainty as to whether the title to commons extended at all south of the river Des Pbres. It is necessary, therefore, to bring into view some of the provisions of that act, and the action of Ca-rondelet and the Executive Departments of the Government through the period of forty-three years that elapsed between 1812 and 1855.
By the first section of the act of 1812 it was enacted as follows : “And it shall be the duty of the principal deputy surveyor of the said Territory, as soon-as may be, to survey, or caused to be surveyed and marked, (where the same has not already been done according to law,) the out-boundary lines of the said several towns or villages, so as to include the out-lots, common-field lots, and commons thereto respectively belonging. And he shall make out-plats of the survey, which he shall transmit to the surveyor-general, who shall forward copies of the said plats to the Commissioner of the General Land-Office and to the recorder of land-titles.”
This provision designates the officer to make surveys and the officer to whom the plats of the survey should be transmitted ; the former being styled “ the principal deputy-surveyor of said Territory,” and the latter “ the surveyor-general.” It is necessary, as will presently appear, to know the legal character of those officers, and it is found by reference to previous acts of Congress.
The Act May 18,1796, “providing for the sale of the lands of the United States in the territory northwest of the fixer Ohio, and above the month of Kentucky River,” (1 Stat. L,,p. 464,) created the office of surveyor-general.
The Act February 28, 1806, u extending thepoicers of the surveyor-general to the Territory of Louisiana, and for other purposes,” (2 Stat. L., p. 352,) required the surveyor-general “ to appoint a sufficient number of skillful surveyors as his deputies in the Territory of Louisiana, one of whom he shall, with the approbation of the Secretary of the Teasury, designate as his principal deputy for the same j ” and the principal deputy was required to reside and keep an office in said Territory of Louisiana, *459 aud, under the superintendence of the surveyor-genera], to execute, or cause to be executed by other deputies, such surveys as might thereafter be authorized by law.
These provisions were in force when the Act June 13, 1812, was passed; and hence the designation in that act of “ the principal deputy-surveyor of said Terri tery ” as the officer to make snrveys of the claims thereby confirmed.
On the 29th of April, 1816, (3 Stat. L., p. 325,) an act was passed creating the office of “ surveyor of the lands of the United States in the Territories of Illinois and Missouri,” and abolishing the office of “ principal deputy-surveyor,” and devolving his duties upon the newly-created officer -, among which duties the act named that of causing to be surveyed the claims which had been, or might thereafter be, confirmed by any act of Congress, aud which, had not already been surveyed according to law.
The bearing of these acts upon this case will now be seen.
In the latter part of the year 1816 Elias Sector, a deputy-surveyor under William Rector, the surveyor for Illinois and Missouri, appointed under the last-named act, made a survey, the field-notes of which, without date and signed merely with the initials “ E. R.,” and accompanied by no plat, were deposited in the office of the surveyor. Why, or by whose direction, or by what authority he made said survey, does not appear; nor does it appear that William Rector, or any of his successors in office, ever approved that survey. On the contrary, it appears that, as late as the 25th of April, 1829, William McGree, then surveyor for Illinois and Missouri, in answer to a specific inquiry whether there were any official documents known to him which showed that any limits of the claim of Oarondelet to commons had ever been designated, and whether he had any other official knowledge on that subject than what was contained in the Act 13ih June, 1812, stated that the only information possessed by his office and on file therein was that act and a statement in the “Registre d’Arjventage,” from which it appeared that, by virtue of an order from the lieutenant-governor, a line had been run from the southwest corner of the lands of the inhabitants of Oarondelet to the river Des Peres.
This line can be no other than that -which was run by Surveyor Soulard in 1797, which included nothing south of the river Des Peres.
*460 Hence it appears that, whenever or however the field-notes of Rector’s survey found their way into the surveyor’s office, they were not in 1829 recognized by that officer as indicating the limits of the commons of Oarondolet, if, indeed, they were at all known to him.
In fact, there is no evidence in the case showing' any recognition whatever of that survey by any officer of the Government prior to the year 1834, when Surveyor Langham ordered his deputy, Joseph 0. Brown, to retrace the lines of Rector’s survey; which was substantially done.
In the absence of recognition by the surveyor-general, that survey had no force or value as an official ascertainment of the limits of the Carondelet commons; for, though Elias Rector was a deputy surveyor, he was not “ the principal deputy surveyor of the Territory” mentioned in the act of 1812. As just shown, no such office as “principal deputy surveyor” existed after the 29th of .April, 1816. In lieu of him was the surveyor for Illinois and Missouri, whose duty it was to cause the commons to be surveyed; and no survey made — as was that of Elias Rector, so far as appears — without the authority of that officer had any legal effect in determining the limits of the commons.
Hence, though the title of Carondelet to commons actually depended upon the making of an authentic survey, a period of nearly twenty-three years elapsed after the passage of the act of 1812 before proper steps were taken by the proper officer to cause'it to be made. They were taken only when Brown’s survey was made in 1834. So far as appears, that was the first legitimate and authorized attempt to ascertain and fix the limits of the commons.
While the extent of the title of Carondelet was thus undefined, and while it had not been officially ascertained whether the commons extended at all south of the river Des Peres, it seems that the belief that they did so extend had arisen among the inhabitants of Carondelet and others; for in July, 1826, an assistant quartermaster of the United States Army procured twelve of the inhabitants to execute to the United States a quitclaim deed for a tract of laud lying Avithin the out-boundary lines of Rector’s survey, and described as “ a part of a large quantity which the said parties of the first part claim as common, belonging to the inhabitants of the village of Carondelet.” This tract lay south of the river Des Peres, and the description *461 called for the southern boundary-line of the commons as a limit.
The execution of this deed was followed by the taking possession by the Government of the tract conveyed, and the subsequent erection thereon of Jefferson Barracks.
From this time till 1855 there was a controversy between Carondelet and the Government in regard to the title of the former to commons south of the river Des Peres, the history of which is given at large in the finding of the facts, and which need not be repeated here.
It is sufficient for the purposes of this opinion to say, that Brown’s survey contained within its out-boundaries nearly double the quantity of land claimed by the inhabitants of Oar-ondelet in 1808 before the board of commissioners; that, in January, 1841, the Commissioner of the General Land-Office disapproved of Brown’s survey, and directed the surveyor-general at Saint Louis to represent on his records a portion of the land within that survey, estimated to contain 7,700 acres, and including the barracks trate, as reserved for the future action of Congress; and to cause the remainder of the land included in Brown’s survey to be surveyed as public land, to the end that it might be brought into the market as such.
In 1853 the subject of Oarondelefs title came before Secretary Stuart, of the Department of the Interior, who held that Carondelet was entitled to 6,000 arpents of land, and no more; and directed that quantity to be laid off, if it could be had without interfering with the rights of others which had vested prior to the Act June 13, 1812.
From this brief history of the action of the Government officers, in connection with this subject, we turn to the proceedings of the corporate authorities of Carondelet, which resulted in the execution, in 1854, of the deed whose validity is assailed by the claimant.
Carondelet had subdivided the land south of the river Des Peres into small tracts, and, in 1839 and 1845, leased the same to individuals, probably one hundred in number, with express stipulation that Carondelet should not be responsible in case of a failure of title. The lessees were, therefore, dependent for title upon the existence of an authentic official survey of the commons south of that river. They had doubtless relied on that of Brown. When, therefore, the action of the Commis *462 sioner of the General Land-Office became known, but more especially after the decision of the supreme court of Missouri, in 1844, in Dent v. Bingham, (8 Missouri, p. 579,) adverse to the title of Oarondelet, as defined and limited by Brown’s survey; the lessees were greatly disturbed, and, without doubt, endeavored to influence the authorities of Oarondelet to take some action which would settle the dispute about the survey favorably to their title.
On the 27th of December, 1851, the city council of Oaronde-let, of their own mere motion, so far as appears, and certainly without any suggestion thereto by any officer of the Government, passed an ordinance authorizing the mayor of the city to execute a deed to the United States for the barracks tract, and requiring the deed when executed to be transmitted to the authorized agent of Oarondelet iu Washington City, to be retained by him until directed by the mayor, under a resolution of the city council, to deliver the same to the proper agent of the Government in Washington City.
On the 24th of January, 1852, the council passed a supplementary ordinance requiring that the deed previously authorized should be a quit-claim deed containing a reversionary clause to the effect that so long as the United States Government should use the said tract of land for military purposes the title should vest and remain in said Government, but when it should cease to be used for that purpose the title should revert to Oarondelet.
On the 28th of February, 1852, the city council, being requested by the agent of Oarondelet in Washington City to send him an absolute deed for the barracks tract, passed an ordinance repealing that prescribing a re versionary clause; and at the same time adopted resolutions directing the mayor to retain the deed to the United States until advice could be received of a decision by the Department of the Interior favorable to the claim of the commons south of the river Des Peres, and transmit the same as soon as such advice should be received.
Again, on the 27th of June, 1854, no settlement of the controversy in regard to the commons having been effected, the city council of Oarondelet passed another ordinance, again repealing that which prescribed a reversionary clause in the deed, and directing the mayor to execute a deed to the United *463 States of tbe barracks tract, and transmit the same to the Secretary of the Interior.
Under this ordinance a deed was executed and transmitted j but being in the opinion of the Attorney-General defective, it was accepted provisionally, until another free from defects could be executed, which was done on the 25th of October, 1854. The deed executed on that day was delivered to the Secretary of the Interior and recorded, and is that which it is sought in this suit to have declared null and void.
On the 23d of February, 1855, the Secretary of the Interior, Mr. McClelland, finally decided in favo.r of Brown’s survey of the commons, excluding the barracks tract, and reserving to parties claiming adversely to Oarondelet the right to establish and settle their rights before the judicial tribunals of the country-
This terminated the protracted controversy until Oaron-delet instituted this suit to recover the value of the barracks tract.
To sustain that claim the claimant relies upon two positions: 1. That the action of the Commissioner of the General Land-Office, disapproving of Brown’s survey, and the decision of Secretary Stuart of the same import, and the final decision of Secretary McClelland excluding the barracks tract from the confirmation of Brown’s survey, were all without authority of law; and 2. That Carondelet was constrained by the illegal acts of the first-named two officers to make the deed of 1854 in order to obtain a final settlement of her title ; and the said deed, having been given without consideration, is void; and therefore the claimant is entitled to recover of the United States the value of the barracks tract.
As to the first point, we hold that the action of the Commissioner of the General Laud-Office and of the two Secretaries of the Interior was within the purview of their lawful authority, and that the final decision of Secretary McClelland was conclusive, and cannot be reversed or revised by the judiciary.
So far as the action of the Commissioner is concerned, the case is almost identical in its main features with that of Castro v. Hendricks, (23 How., p. 438.) There the Commissioner of the General Laud-Office refused to issue a patent for a tract of land in California which had' been confirmed to Castro, and ‘ surveyed for him under the authority of the surveyor-general *464 of California; and tbe refusal was based upon tbe fact that tbe lines of tbe survey ran out of tbe grant which bad been confirmed into tbe public land, and gave to Castro two leagues and a half more land than be ought to have; tbe surplus being' taken from the lands of the United States. Castro sought by mandamus to compel tbe Commissioner to execute to him a patent of th e land as surv e j (<3; but Supreme Court held that the Commissioner is b3r law invested with a supervision and control over tbe acts of subordinate officers charged with making surveys, and that bis refusal to issue tbe patent was an appropriate exercise of tbe functions of bis office.
Tbe action taken by the Secretary of tbe Interior is equally sustained by this decision; for be is by law tbe superior officer authorized to control the action of tbe Commissioner. There is, then, no ground whatever for bolding tbe acts of either the Commissioner or tbe Secretary in the premises to have been an unlawful exercise of power.
Tbe determination of that point leaves nothing for tbe claimant to rest tbe other branch of bis case upon. It is claimed that tbe deed of Carondelet to the United States conveying tbe barracks tract is void, on two grounds: 1. That Carondelet was constrained by the illegal acts of tbe Commissioner and Secretary Stuart to make tbe deed; and, 2. That tbe deed, having been made without consideration, is void; and therefore tbe claimant is entitled to recover tbe value of the land. Tbe first position having been shown to be untenable, the claimant’s whole case rests upon tbe second.
In regard to this, while it is true that tbe United States paid no money to Carondelet as a consideration for the execution of that deed, yet there was, in fact, ample consideration in law to sustain it, in tbe benefit conferred on Carondelet by tbe final settlement of its doubtful title to commons. From the first it bad been a question -whether tbe village was entitled to any land as commons south of the river Des Peres, and also what quantity of land it was entitled to as commons. Though tbe claim of Carondelet was confirmed, those two points had to be determined before tbe extent and boundaries of tbe claim could be fixed; and until they were fixed tbe title was incomplete. Carondelet would not wait until they were officially and definitively settled, but proceeded to subdivide and lease lands within boundaries which bad never been finally sanctioned by *465 tbe proper .authorities. Trouble necessarily ensued, not only between Garondelet and the United States, but between Caron-delet and its lessees. The only possible relief from that trouble, under the then existing laws, was in a final and authoritative settlement of the boundaries of the commons.
Under these circumstances Oarondelet, in 1851, made the first move in the direction of relinquishing all claim to the barracks tract, in order to procure the confirmation of Brown’s survey, and authorized a deed to that effect to be executed. Again, in 1854, the move vras repeated. In both instances Carondelet acted without any suggestion thereto by the Government, with a full knowledge of all thefacts, and under legal advice. No constraint was exercised over her authorities in their action. Much less was there anything like duress. So far as appears, they acted with perfect freedom, and directed their action to accomplish a result of great benefit to the city and those holding under it. There is no ground, therefore, for invalidating the deed executed by Oarondelet to the United States.
The petition of the claimant must be dismissed.